**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-01339-STV

GINA MARTIN, M.D.,
AMANDA SWANSON, M.D., and
SUSAN BRIGHT, M.D.,

      Plaintiffs,

v.

DELTA COUNTY MEMORIAL HOSPITAL DISTRICT, d/b/a Delta County Memorial Hospital,

      Defendant.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Defendant's Motion for Summary Judgment [#44] and Defendant's Motion in Limine to Exclude Expert Testimony [#45] (collectively, the "Motions"). The Motions are before the Court on the parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment. [##13, 14] This Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motions. For the following reasons, Defendant's Motion for Summary Judgment [#44] is **GRANTED in part** and **DENIED in part** and Defendant's Motion in Limine to Exclude Expert Testimony [#45] is **DENIED as MOOT**.

I.      **MOTION FOR SUMMARY JUDGMENT**

    **A.  BACKGROUND**[1]

This is an employment discrimination matter brought by three female family practice physicians—Dr. Amanda Swanson, Dr. Susan Bright, and Dr. Gina Miller[2]—against their former employer, Defendant Delta County Memorial Hospital ("DCMH").  [#1]

    **1.  Delta County Memorial Hospital**

DCMH has thirteen clinics in various Colorado cities, including Delta, Hotchkiss, and Paonia.  [SOF#1]  When a physician is hired to work at DCMH, they must obtain privileges to perform services.  [SOF#3]  To obtain privileges, a physician must show that they have the education and experience to perform a particular service.  [SOF#4]  In general, physicians at DCMH work call groups based on the privileges the physician holds. [SOF ##6-7]  Physician salaries are determined by a physician's scope of practice—as indicated by the privileges they hold and the services they provide—and their years of experience.[3]  [SOF ## 5, 140]

---

[1] The undisputed facts are drawn from the Separate Statement of Facts filed with Defendant's Motion for Summary Judgment [#63-1].  The Court refers to the sequentially numbered facts set forth in the Separate Statement of Facts as "SOF#."  The Court periodically cites directly to the exhibits cited by the parties to provide additional context. Disputed facts are identified as such.

[2] Dr. Gina Miller formerly went by "Dr. Gina Martin."  [SOF #18]  Because her current name is "Miller," the Court will refer to her as such throughout this Order.

[3] Plaintiffs argue that, in addition to practice area and years of experience, physician pay at DCMH is decided, in part, based on the amount of revenue brought in by a particular physician.  [*See* SOF#5]  As support for this assertion, Plaintiffs cite to deposition testimony by Drs. Swanson, Bright, and Miller, in which each doctor states that she was one of the highest grossing physicians in the practice.  [##61-13 at 4(40:5-43:7) (Dr. Swanson stating that she was a top revenue producer for hospital consistently); 61-14 at 3(38:16-39:15) (Dr. Bright stating she was one of highest grossing physicians); 61-10 at 5(34:21-35:16) (Dr. Miller saying she was one of the top grossing physicians)]  But this testimony does not establish that physician pay was determined by revenue; it does not even indicate that the Plaintiffs themselves believed that revenue was part of their

## 2.  DCMH Acquisition of Delta Family Physicians

Before working for DCMH, Dr. Amanda Swanson and Dr. Susan Bright were physicians at Delta Family Physicians ("DFP").  [*See* SOF ##14-16]  During 2014, DCMH acquired DFP and therefore hired DFP physicians Dr. Bruce Mixter, Dr. Ryan Marlin, Dr. Bright, and Dr. Swanson.  [*Id.*]  At the time of the acquisition, Dr. Gina Miller was in negotiations to be hired at DFP.  [SOF #17]  Thus, when DFP was acquired by DCMH, Dr. Miller began negotiations directly with DCMH and was eventually hired by DCMH. [*Id.*]

During contract discussions leading up to the acquisition, Dr. Marlin met with DCMH's CEO, Jason Cleckler, and discussed physician salaries at DFP, including his own salary and the salaries of the other physicians.[4]  [SOF #76]  At the time of the 2014

---

compensation.  [*See id.*]  By contrast, Defendant has identified deposition testimony by DCMH's Human Resources Executive Director, Rhonda Katzdorn, and Dr. Ryan Marlin indicating that it was not until 2020 that DCHM physician contracts were changed to provide bonuses for productivity and performance [## 61-15 at 5(51:2-52:14); 63-2 at 19(83:4-14)], as well as deposition testimony from DCMH CEO Jason Cleckler indicating that *after* Plaintiffs left the hospital, a board member expressed a desire to change physician contracts to be performance and productivity based.  [#63-2 at 6(79:7-80:11)] Thus, there is no evidence in the record by which the Court can find that productivity and revenue were factors in determining physician pay at the time that Plaintiffs were employed by Defendant.

[4] The parties disagree as to the state of salary increases provided to the physicians when DFP was acquired by DCMH hospital.  [*See* SOF##76-79]  For example, Dr. Marlin testified that he received "quite an increase" in salary, to $180,000 per year, when he was hired at DCMH, but this statement and the surrounding deposition testimony do not indicate whether Dr. Marlin was speaking of an increase from his base salary which was around $120,000, or from his salary plus bonuses, and does not identify the total amount he was paid at DFP in the year before the acquisition.  [*See* #63-2 at 17-18(75:10-78:17)] Similarly, Dr. Bright's deposition testimony states that her starting salary at DCMH was "approximately the same as [she] had made the year prior," but it is unclear if by that she means the total amount she was paid, including bonuses, or solely her "routine" salary. [#44-4 at 2(12:19-14:14)]  Indeed, the parties have not provided the Court with any evidence that definitively indicates what the various physicians were paid prior to the acquisition, and thus the Court has no means by which to determine whether any

acquisition, DCHM provided the various new physicians with contracts containing the following terms:[5]

| Physician | Sex | Term | Practice Area | Call Area | Call Protection | Salary | Termination Notice[6] |
|---|---|---|---|---|---|---|---|
| Dr. Susan Bright | F | Indefinite | Family Practice; Obstetrics | Family Practice; Obstetric | 1:4 | $170,000 | 120 days |
| Dr. Gina Miller | F | Indefinite | Family Practice; Obstetrics | Family Practice; Obstetric | None indicated | $150,000 | 120 days |
| Dr. Amanda Swanson | F | Indefinite | Family Practice; Obstetrics | Family Practice; Obstetric | 1:4 | $150,000 | 120 days |
| Dr. Bruce Mixter | M | Indefinite | Family Practice | Family Practice | None indicated | $120,000 | 120 days |
| Dr. Ryan Marlin | M | Indefinite | Family practice; Obstetrics; Surgical[7] | Family Practice; Obstetric | None indicated | $180,000[8] | 120 days |

In June 2015, Plaintiffs received a special pay adjustment; they additionally received a 5% pay increase each year.  [SOF ##26-27]

---

particular physician received a raise and, if so, how substantial those raises actually were. [*See* #44-4 at 7(17:15-17) (Dr. Swanson stating that she was "pretty sure" her salary at DFP was $140,000); *Id*. at 8-9(23:18-24:1) (Dr. Swanson stating she may have misspoken and that her salary at DFP may have been $150,000); *Id*. at 2(14:6-12) (Dr. Bright stating she does not remember specifically what her salary was, only that it was "approximately the same"); #63-2 at 17(75:10-24) (Dr. Marlin stating that he doesn't recall if the base salary was ever increased above $120,000).

[5] #44-3 at 8-13 (Dr. Bright's contract); #44-3 at 27-33 (Dr. Miller's contract); #44-3 at 17-23 (Dr. Swanson's contract); #44-4 at 17-25 (Dr. Mixter's contract); #44-4 at 27-36 (Dr. Marlin's contract).

[6] The termination notice in each contract varied depending upon the year of termination. [*Id*.]  The dates listed below include any termination after the second year of the doctors' employment was completed.  [*Id*.]

[7] Specifically, Dr. Marlin's contract indicated that he was to provide inpatient and outpatient endoscopy services.  [#44-4 at 28]

[8] In July 2015 Dr. Marlin and CEO Cleckler signed an addendum to Dr. Marlin's 2014 contract, reducing Dr. Marlin's hours to 30 hours per week and decreasing his annual salary to $142,500.  [#44-4 at 37]   A February 2015 addendum reduced to Dr. Marlin to a four day per week schedule based on 30 hours per week and changed his salary to $120,000.  [*Id*. at 38]

When DCMH acquired DFP, DCMH already employed a family practice physician, Dr. Jesus Ochoa.  [SOF #9]  Dr. Ochoa was hired by DCMH on April 5, 2010, to primarily work in the clinical setting and urgent care in Olathe, Colorado.   [SOF ##9, 11]  Dr. Ochoa's 2010 contract terms were as follows:

| Physician | Sex | Term | Practice Areas | Call Areas | Call Protection | Salary | Termination Notice[9] |
|---|---|---|---|---|---|---|---|
| Dr. Jesus Ochoa[10] | M | Indefinite | Family Practice | Family Practice | None indicated | $170,000 | 120 days |

When Dr. Ochoa was hired, he had not delivered a baby since his residency.  [SOF #10]  Accordingly, Dr. Ochoa was not hired to perform obstetrics services and did not apply for obstetrics privileges.   [SOF#12[11]; #44-3 at 69(24:24-27:4)]   However, Dr. Ochoa did provide dermatological services at DCMH.[12]   [SOF ## 13, 291]   Dr. Ochoa additionally worked in the Urgent Care, for which he received $10.22 per hour above his usual rate.  [SOF #199-200]

---

[9] As with Drs. Bright, Miller, Swanson, Mixter, and Marlin, Dr. Ochoa's termination notice depended upon the year of termination.  [#44-3 at 54-62] The termination notice in each contract varied depending upon the year of termination.  [*Id.*]  The date listed below includes any termination after the second year of Dr. Ochoa's employment was completed.  [*Id.*]

[10] *Id.*

[11] Plaintiffs indicate that they dispute Defendant's proposed fact that "Dr. Ochoa did not have privileges at the hospital to perform surgical obstetrics or work with newborns." [SOF#12]  However, in their explanation of the dispute they address a completely different matter—whether Dr. Ochoa participated in call—and additionally state that "[Dr. Ochoa] *could* have acquired the skills for OB but chose not to."  [*Id.* (emphasis added)]  Based on this statement, the Court understands Plaintiffs to agree that Dr. Ochoa did not, in fact, have the skills to perform obstetrics services.

[12] Plaintiff indicates in the Separate Statement of Facts that they object to Defendant's proposed fact that "Dr. Ochoa later added dermatological services to the services he provided."  [SOF#13]  However, Plaintiffs' objection appears to be solely on the value of those dermatological skills, and not as to whether Dr. Ochoa did in fact provide dermatology services.  [*See id*. (Plaintiffs' statement that "Dr. Ochoa's dermatology skills were not valuable to the defendant.")].  Elsewhere in the Statement of Facts, Plaintiffs themselves state that "Dr. Ochoa provided dermatology services."  [SOF#291]

### 3.  New Physicians Hired, 2015-2017

DCMH did not hire any family practice physicians in 2015; however, during 2016 DCMH hired two physicians, Dr. Michelle Reed and Dr. Marie Matthews.  [SOF ##32-33]  Their contracts contained the following terms:[13]

| Physician | Sex | Term | Practice Areas | Call Areas | Call Protection | Salary | Termination Notice[14] |
|---|---|---|---|---|---|---|---|
| Dr. Michelle Reed | F | 3 years | Family Medicine | Internal Medicine | None indicated | $200,000 | 120 days |
| Dr. Marie Matthews | F | 3 years, renewable | Family Practice; Obstetric; Surgical Obstetric | Family Practice; Obstetric | 1:4 | $190,000 | 90 days |

In addition to their salaries, Dr. Reed received a one time "commencement bonus" of $6,500, and Dr. Matthews received a "commencement bonus" of $20,000.  [SOF ##32-33; #44-5 at 1, 28]

In 2017 DCMH hired two additional physicians.  [SOF ##34-35]  In determining the salaries to pay these physicians, DCMH reviewed the "MGMA," which contains a data report on physician salaries.  [*See* SOF ##313-317]  Their contracts contained the following terms:[15]

---

[13] *See* #44-5 at 1-12 (Dr. Reed's contract); #44-5 at 22-36 (Dr. Matthew's contract).
[14] As with Drs. Bright, Miller, Swanson, Mixter, Marlin and Ochoa, Dr. Reed's termination notice depended upon the year of termination.  [#44-5 at 1-12] The termination notice in each contract varied depending upon the year of termination.  [*Id.*]  The date listed below for Dr. Reed includes any termination after the second year of her employment was completed.  [*Id.*] Dr. Matthews' termination notice was ninety days regardless of the year of termination.  [#44-5 at 22-36]
[15] *See* #44-5 at 40-55 (Dr. Lebsack's contract); #44-5 at 56-68 (Dr. Richman's contract).

| Physician | Sex | Term | Practice Areas | Call Areas | Call Protection | Salary | Termination Notice |
|---|---|---|---|---|---|---|---|
| Matthew Lebsack | M | 3 years, renewable | Family Practice; Obstetric | Family Practice; Obstetric | 1:7 | $170,000 | 90 days |
| Dr. Jonathan Richman | M | 3 years, renewable | Family Practice; Obstetric; Surgical[16] | Family Practice; Pediatric; Obstetric | 1:4 | $206,636.06 | 90 days |

In addition to his salary, Dr. Lebsack received a one time "commencement bonus," of $20,000.   [#44-5 at 46] Dr. Richman's contract provided for three bonus payments: (1) $25,000 "payable on the Physician's first pay check", (2) $20,000 "on the first full pay period following the first year of employment," and (3) $10,000 "on the first full pay period following the second year of employment.  [#44-5 at 61]

Dr. Lebsack was hired to work in the Hotchkiss, Colorado clinic, but sometimes worked at the hospital itself.  [SOF ##69-70]  Although Dr. Lebsack was hired to perform both family practice and obstetrics services, he was not automatically granted privileges to perform surgical obstetrics—nor added to the obstetric call group—because he did not have the necessary experience to perform c-section births.  [SOF ##37, 38]  Instead, Dr. Lebsack was hired with the understanding that he would gain experience working with other physicians in order to obtain obstetrics privileges and join the obstetrics call group only after gaining privileges.  [SOF#39]  Ultimately, Dr. Lebsack joined the family practice call group about one month after he began working at DCMH, and joined the obstetrics call group about six months after starting at DCMH.  [SOF#40]

---

[16] The surgical services provision of Dr. Richman's contract includes inpatient and outpatient endoscopy services.  [SOF#34; #44-5 at 57].

#### 4.  Physician Call Schedules

Generally speaking, Plaintiffs found that call was difficult on their personal lives. [*See* SOF ##93-98]  For a period of time in 2015 and 2016—after letting go of an OB/GYN physician—DCMH paid family practice physicians an extra $1,500 per day to be on obstetrics call with increased frequency.  [SOF#83]  In the summer of 2016, Dr. Swanson met with CEO Cleckler regarding tensions related to the call schedule.  [SOF#84]  Mr. Cleckler then communicated the content of that meeting to Dr. Marlin.  [SOF#85]  In August 2016, Dr. Swanson called a meeting of obstetrics providers and hospital management regarding the call schedule.  [SOF#87]  At the meeting, Dr. Swanson told the other providers that the call schedule she had discussed with Mr. Cleckler was not the schedule Mr. Cleckler ultimately adopted.  [SOF#86; #61-6]

Also, during 2016, Dr. Marlin approached CEO Cleckler regarding his scope of practice.  [SOF#54; #61-2 at 2(16-17)]  Specifically, Dr. Marlin requested to stop doing obstetrics work for the hospital for the following reasons:  (1) he no longer felt comfortable doing obstetrics work because his patient volume had decreased, and (2) the call schedule was difficult on his family because his wife worked full time and he had two small children.  [SOF#92; #61-2 at 2(16:9-20); *See also* #61-9 at 2 (September 2016 DCMH OB/Newborn Committee meeting minutes indicating that Dr. Marlin wished to stop seeing obstetric patients by end of year because of his decreased obstetric volume)]  Mr. Cleckler permitted Dr. Marlin to stop doing obstetrics work after December 2016.  [SOF#90; #61-2 at 2(17:12-22)]  The call schedule was impacted by Dr. Marlin removing his obstetrics privileges.  [SOF#99; *see also* ## 61-5 (describing Dr. Swanson's concerns regarding obstetrics call); 61-6 (meeting minutes discussing the call schedule); 63-2 at 9(153:16-

154:7) (Mr. Cleckler's deposition testimony describing how Dr. Marlin's decreased privileges would change the call schedule)]  Dr. Marlin did not sign a new contract officially omitting obstetrics as an area of practice until November 2017, and he received a rate reduction from $100.72 per hour to $95.92 per hour in December 2017.[17]  [#44-4 at 42-53, 57]

After removing his obstetrics privileges, Dr. Marlin began doing after-hours "call"[18] in family medicine, which consisted of taking patient phone calls after hours for a week at a time.  [SOF ##55, 81]  In the fall of 2017, Dr. Marlin requested to be removed from pediatric privileges.  [SOF#120]  Mr. Cleckler agreed to permit Dr. Marlin to reduce his scope of practice in this way.  [SOF#122; #61-2 at 8(48:18-25); #61-7 at 10(154:16-23)] On September 19, 2017, Dr. Marlin sent a letter to DCMH Family Medicine and Pediatric Call group stating that he would "no longer continue practicing inpatient pediatrics after January 1, 2018."  [SOF#54; #61-9 at 3]

### 5.  Dr. Miller's FMLA Leave and Reprimand

Beginning in February 2017, Dr. Miller began taking intermittent leave under the FMLA for a rare pregnancy disorder called hyperemesis gravidarum.  [SOF ##74, 100] After the birth of her child, Dr. Miller took twelve weeks of continuous leave.  [SOF#73]

On July 10, 2017, before she delivered her child, Dr. Miller received a Default in Employment Agreement Memorandum ("the Memorandum").  [SOF ##46, 101]  Dr. Miller

---

[17] Dr. Marlin received an annual raise increasing his hourly rate from $91.35 to $95.92 on October 9, 2016 [#44-4 at 58], and an annual raise on October 8, 2017, increasing his hourly rate from $95.92 to $100.72, [*id*. at 59].

[18] The parties dispute whether this service can appropriately be called "call."  [*See* SOF ##55, 81]  Regardless of what it is called, the parties do not appear to dispute that Dr. Marlin began performing this task.  [*Id*.]

was "shocked" to receive the reprimand.  [SOF#103]  The Memorandum listed four areas of default: (1) regarding offensive language to co-workers and the Clinic Manager;  (2) regarding call shift and proper procedure for requesting fellow practitioners to take call shifts; (3) regarding patient numbers and patient complaints of inappropriate behavior and language; and (4) regarding defiance, including interruptions in meetings and defiance to CEO Cleckler.  [#44-6 at 10-11]

On July 23, 2017, Dr. Miller responded by letter to the hospital, in which she: (1) apologized for offensive language and agreed to cease using such language; (2) disputed that she had used offensive language in front of patients and that she had been involved in certain cited incidents; (3) disputed that her call schedule had been a "burden to fellow practitioners;" (4) requested to see any patient complaints; (5) explained that her FMLA leave had impacted patient appointments and that her office manager had failed to ensure her schedule was full; (6) disagreed that she had been disruptive in meetings; and (7) apologized for any misunderstanding between herself and Mr. Cleckler. [SOF#105; #61-11]  Dr. Miller thereafter modified her behavior by reducing the use of cuss words in her vocabulary.  [SOF#47]  The reprimand did not factor into Dr. Miller's continued employment.  [SOF#119]

### 6.  Proposed New Contracts

During 2016 and 2017, DCMH sought to standardize physician contracts. [SOF#48]  DCMH offered Drs. Miller, Swanson, Bright, and Marlin new contracts in the

fall of 2017; it offered Dr. Ochoa a new contract in 2018.  [SOF ##49-53]  The terms of the offered contracts are as follows:[19]

| Physician | Sex | Term | Practice Areas | Call Areas | Call Protection | Salary | Termination Notice |
|---|---|---|---|---|---|---|---|
| Dr. Susan Bright | F | 3 years | Family Practice; Obstetric | Family Medicine; Pediatric; Obstetric | Equitable | $216,499.92 | 60 days |
| Dr. Gina Miller | F | 1 year | Family Practice; Obstetric | Family Medicine; Obstetric | Equitable | $181,927.20 | 30 days |
| Dr. Amanda Swanson | F | 3 years | Family Practice; Obstetric | Family Medicine; Obstetric | Equitable | $202,587.84 | 60 days |
| Dr. Jesus Ochoa | M | 3 years, renewable | Family Practice | Family Medicine; Pediatric | Equitable | $234,648.96 | 90 days |
| Dr. Ryan Marlin[20] | M | 3 years | Family Practice; Surgical | None | n/a | $149,635.20 | 60 days |

Dr. Ochoa and Dr. Marlin signed and returned the new contracts.  [SOF#57] Doctors Miller, Bright, and Swanson did not immediately return the proposed contracts, and instead engaged in negotiations as follows:

### a. Dr. Miller's Negotiations

Dr. Miller received the proposed contract by email while she was still out on FMLA leave.  [SOF#123]  In early November 2017, Dr. Miller arranged to meet with the hospital about her new contract and emailed a redlined version and her attorney's contact information to Mr. Cleckler.  [SOF#208]  However, the day of the meeting, Ms. Katzdorn emailed Dr. Miller and stated: "After reviewing your requested changes to your

---

[19] *See* #44-6 at 36-47 (Dr. Bright's contract); #44-6 at 12-23 (Dr. Miller's contract); #44-6 at 24-35 (Dr. Swanson's contract); #44-3 at 42-53 (Dr. Ochoa's contract); #44-4 at 42-53 (Dr. Marlin's contract).

[20] Dr. Marlin's contract indicated that he was to provide outpatient endoscopy surgical services.  [#44-4 at 43] Additionally, he was contracted to work 30 hours per week, instead of 40 hours.  [*See* #44-4 at 45]

Employment Agreement, I am not prepared to meet with you today. I will need to reschedule the meeting after I have time to discuss everything with our Attorney." [#61-23 at 1] Dr. Miller did not hear anything for a few weeks, but eventually a meeting was scheduled between Dr. Miller, Mr. Cleckler, Ms. Katzdorn, and two board members. [SOF#210; #61-10 at 13(64:4-22)]

The meeting took place on December 14, 2017. [SOF#59] DCMH denied Dr. Miller's request to have her attorney present. [SOF#233] Dr. Miller left the meeting without signing the new contract; she indicated that she was unwilling to sign the contract and has since testified that "it appeared [to her] there would be only two potential outcomes after that meeting, which included [DCMH's] termination of [Dr. Miller] or forced resignation by [Dr. Miller]." [#61-10 at 15(91:12-19); SOF ##236-38] DCMH said that it would follow up with Dr. Miller. [SOF#240] On December 18th, 2017, DCMH sent Dr. Miller an email stating: "Based on your rejection of our 2017 Contract at the meeting Thursday, December 18 [sic], 2017, our offer of contract is off the table. We accept your verbal resignation from your position." [SOF#241] At the end of that workday, hospital representatives assisted Dr. Miller in packing up her office and leaving the hospital. [SOF#242]

b.  Doctors Swanson's and Bright's Negotiations

After Drs. Swanson and Bright did not immediately respond to the proposed contract,  on November 27, 2017, DCMH sent each physician a letter "as [their] official 120-day contract termination notice" pursuant to the terms of the existing contract.  [SOF

##211, 214]  Although Dr. Marlin did not sign his contract until November 30, 2017, DCMH did not send him any similar letter.[21]  [SOF ##216, 217; #44-4 at 53]

Drs. Swanson and Bright interpreted the letter as a termination of their employment, not just their employment contract.   [SOF#220]   They then attended DCMH's board meeting on December 4, 2017, and expressed confusion regarding the termination.   [SOF ##221, 222]   Mr. Cleckler responded that they were not being terminated, but that DCMH was trying to make its contracts uniform.  [SOF#223]  After Drs. Swanson and Bright left, a board member asked whether they were the only physicians who had not signed the new contract, and Mr. Cleckler indicated that Dr. Miller also had not signed.   [SOF ##224, 225]   Mr. Cleckler also stated that Dr. Marlin and Dr. Lebsack had signed their contracts and that "this is just a matter of trying to get things uniform."  [SOF#226]

On December 6, 2017, Mr. Cleckler sent Drs. Swanson and Bright each a letter which said:

> This letter is a follow-up to your grievance filed to the DCMH Hospital Board on Monday, December 4, 2017.  I would like to clarify the letter you received dated November 27, 2017.
>
> You had a new contract in your possession, at the time you received the letter. The 120-day notice was to comply with your current contract. If you do wish to continue your employment with [DCMH], we will need your signed contract agreement prior to March 24, 2018.
>
> If you would like to discuss your new contract . . . set up a meeting date and time that will work with your schedule.

---

[21] Defendant alleges that a termination letter was not sent to Dr. Marlin because between the date that DCMH sent Dr. Marlin the proposed contract—October 23, 2017—and the date he signed that contract—November 30—Dr. Marlin and been in contact with Mr. Cleckler regarding the contract.   [SOF##216, 217; 61-7 at 16-17(205:1-209:6); 61-2 at 10(56:21-58:2)]   Defendant further asserts that Drs. Swanson and Bright had not responded at all to the new contract.  [SOF#216]

[##61-27; 61-28]   On December 12 and 15, 2017, Drs. Bright and Swanson emailed DCMH redlines requesting certain changes to the contracts.  [SOF ##62, 63, 230]  On December 23, 2017, and again on January 18, 2018, Dr. Bright emailed DCMH and indicated that her primary concerns with the proposed contract were the call protection and termination notice terms.  [SOF ## 251, 253]  Dr. Swanson made similar attempts to negotiate her contract during late December 2017 and mid-January 2018.  [SOF#260]

On January 15, 2018, Dr. Bright and Dr. Swanson attended another DCMH Board meeting to discuss call protection.  [SOF#257]  Dr. Swanson asked for someone on the board to review the contracts to see the inequality among the provisions.  [SOF#261]  A male board member, David Lane, called Dr. Swanson and confirmed that the contracts did in fact differ.  [SOF#263] He asked if she would be willing to sign the new contract anyway, and she refused to sign it without her lawyer first reviewing document.  [SOF ##263, 264]

On January 17, 2018, DCMH offered Dr. Bright 1:4 call protection.  [SOF##258, 259] Nonetheless, Dr. Bright and DCMH were unable to reach an agreement on the new contract.  [SOF ##64, 265] On January 22, 2018, Dr. Bright sent DCMH human resources a letter terminating contract negotiations, indicating that she would not sign the proposed contract, and confirming that she would cease to be employed by DCMH as of March 27, 2018.  [SOF ##64, 265; #44-7 at 73]

On January 25, 2018, Dr. Swanson sent an email to DCMH indicating that she was the victim of gender discrimination.  [SOF#267]  DCMH provided Dr. Swanson with the contact information for an investigator, but Dr. Swanson refused to speak with the investigator because she believed there was a conflict of interest.  [SOF ##268-69]  Dr.

Swanson ultimately stopped negotiations with the hospital and did not sign the new contract.  [SOF#270]  Her last day was March 27, 2018.  [SOF#67]

### 7.  Procedural Posture

Plaintiffs initiated this action in May 2019.   [#1] The operative First Amended Complaint asserts four claims for relief:  (1) Claim One for sex discrimination in violation of the Fair Labor Standards Act and Equal Pay Act,  29 U.S.C. § 206(d); (2) Claim Two for retaliation against Dr. Martin for her exercise of FMLA rights under 29 U.S.C. § 2615(a)(2); (3) Claim Three for sex and pregnancy discrimination in Violation of Title VII of the Civil Rights Act of 1964 and as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e *et seq*; and (4) Claim Four for sex and pregnancy discrimination in violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-201 to 406.   [#9] Defendant filed the instant Motion for Summary Judgment on March 12, 2021, in which it seeks summary judgment on all of Plaintiffs' claims.  [#44]  Plaintiffs have filed a response [#61] and Defendant has filed a reply [#63].

### B.  STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994).  When the moving party bears the burden of persuasion at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."  *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).  In other words,

the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331). "The burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial." *Id.*

When the moving party does not bear the burden of persuasion at trial, the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat'l. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### C.  ANALYSIS

Plaintiffs assert four claims for relief:  (1) Claim One for sex discrimination in violation of the Equal Pay Act ("EPA"); (2) Claim Two for retaliation against Dr. Miller for her exercise of Family Medical Leave Act ("FMLA") rights; (3) Claim Three for sex and pregnancy discrimination in violation of Title VII and the Pregnancy Discrimination Act ("PDA"); and (4) Claim Four for sex and pregnancy discrimination in violation of the Colorado Anti-Discrimination Act ("CADA").  [#9]  The Court addresses each claim in turn.

### 1.  Equal Pay Act

The Equal Pay Act prohibits wage discrimination between employees on the basis of sex.  29 U.S.C. § 206(d)(1).  "To establish a *prima facie* case under the EPA, [the plaintiff] has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; [and] (3) the male employees were paid more under such circumstances."  *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1364 (10th Cir. 1997) (quotation omitted) (emphasis in original).

Once the plaintiff has established a prima facie case, the defendant may show that the pay disparity was justified by one of the four "affirmative defenses" identified in the statute:  "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings

by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Riser v. QEP Energy*, 776 F.3d 1191, 1198 (10th Cir. 2015) (quoting 29 U.S.C. § 206(d)(1)); *see also Cnty. of Wash. v. Gunther*, 452 U.S. 161, 168 (1981) (describing these as the EPA's "four affirmative defenses").  "To meet this burden, an employer must 'submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity.'"  *Riser*, 776 F.3d 1191, 1198 (quoting *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006)).  To obtain summary judgment on an affirmative defense, the employer must  "prove at least one affirmative defense so clearly that no rational jury could find to the contrary."  *Mickelson*, 460 F.3d at 1311 (citation omitted); *see also Tenkku v. Normandy Bank*, 348 F.3d 737, 741 n. 2 (8th Cir. 2003) ("At the summary judgment stage of the proceedings, the employer's justification for the differences is irrelevant, unless it is strong enough to establish one of the statutory affirmative defenses as a matter of law.").

Here, Defendant argues that Plaintiffs have not established a prima facie case under the EPA because they cannot show that they performed substantially equal work to that of the male family practice physicians.  [#44 at 10-11]  Defendant further argues that the only comparable male physician is Dr. Lebsack and that any wage disparity was the result of differentials based on factors other than sex.  [*Id*. at 11-13]  The Court considers these arguments in turn.

### a. Equal Work

"The equal work requirement of the EPA is not to be construed broadly."  *Ferroni v. Teamsters, Chauffeurs & Warehousemen Local No. 222*, 297 F.3d 1146, 1149 (10th

Cir. 2002).  "Like or comparable work does not satisfy this standard, and it is not sufficient that some aspects of the two jobs were the same."  *Id*. (quotation omitted). "Rather, in order to prevail in such an EPA action, the jobs must be substantially equal in terms of skill, effort, responsibility, and working conditions." *Sprague*, 129 F.3d at 1364 (quotation omitted); *see also Nulf v. Int'l Paper Co.*, 656 F.2d 553, 561 (10th Cir. 1981) ("It is the overall job, not its individual segments, that must form the basis of comparison." (quotation omitted)).

Defendant argues that Plaintiffs have not established that they did equal work to Drs. Marlin and Richman, because these doctors performed surgical services in the area of endoscopy [#44 at 10-11], and that they did not do equal work to Dr. Ochoa, because he worked in the Urgent Care and provided dermatology services [*id*. at 11].  In response, Plaintiffs state, summarily, that Defendant's argument does not defeat their EPA claim because "the male family practice physicians and the female ones performed substantially equal work, even though some performed endoscopies, dermatology, or occasionally worked at Urgent Care." [#61 at 17]  Plaintiffs then point the Court to certain portions of the separate statement of facts.  [*Id*.]

But the identified facts do not aid the Court in determining whether the "overall job" performed by Plaintiffs and these male doctors is "substantially equal." *Sprague*, 129 F.3d at 1364; *Nulf*, 656 F.2d at 561.  For example, Plaintiffs describe the differences between family medicine physicians and surgeons who are not family medicine physicians [SOF ##274-276, 278], but do not describe in any detail the similarities in the jobs performed by Plaintiffs and the identified male physicians.  [*Id*.]  Plaintiffs thus do not compare the "skill, effort, responsibility, and working conditions" as between Plaintiffs and

these male doctors.  *Sprague*, 129 F.3d at 1364.  Further, in the identified facts, Plaintiffs argue that the male physicians' skills in endoscopy and dermatology should not be "valued higher" in the family medicine practice than skills maintained by Plaintiffs.  [SOF ##280-290]  But the relative monetary valuation of skills does not inform the Court whether the day-to-day jobs performed by Plaintiffs and the male physicians were "substantially equal."  Indeed, the Court is left to speculate as to the tasks performed, skills used, effort expended, and responsibility required by each individual's job.  *Lemke v. Int'l Total Servs., Inc.*, 56 F.Supp.2d 472, 490 (D.N.J. 1999) (noting that although all persons at issue were "district managers . . . the inquiry [of whether the EPA was violated] centers around actual job content as opposed to job titles or descriptions").

Instead, the evidence shows that a number of differences existed between the work performed by Plaintiffs and that of Drs. Marlin, Richman, and Ochoa.  For example, Drs. Marlin and Richman performed endoscopies, while Plaintiffs did not, and Dr. Ochoa performed dermatological services, while Plaintiffs did not.  [SOF ##13, 36; #44-3 at 8-13; #44-3 at 17-23; #44-3 at 27-33; #44-4 at 27-36; #44-5 at 56-68]  Moreover, Dr. Ochoa did not perform any obstetrics services—a skillset and portion of Plaintiffs job that appears to be significant.  [SOF#12]  Thus, at a minimum, the Plaintiffs and these male physicians performed jobs requiring different "skills;" and "skills" is one of the areas under which Plaintiffs must establish that their jobs were substantially equal to that of the identified male comparators.  *Sprague*, 129 F.3d at 1364.

Plaintiffs bear the burden of proof on their prima facie EPA claim, and "[w]hile the court must draw all factual inferences in favor of the non-moving party, the court cannot draw inferences in the absence of proffered, admissible facts."  *Schaeffer v. JBS Carriers*,

Inc., No. 19-cv-01406-NYW, 2020 WL 7043867, at *10 (D. Colo. 2020); *see also Adler*, 144 F.3d at 670-71 (finding the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim."). Accordingly, based on the evidence of different skills and duties, as well as the lack of evidence regarding comparison of jobs, Plaintiffs have not met their burden of showing that Drs. Marlin, Richman, and Ochoa are appropriate comparators for Plaintiffs' EPA claim, and Defendant's Motion is GRANTED as to the EPA claims regarding all physicians except Dr. Lebsack.[22]   *Puchakjian v. Township of Winslow*, 804 F. Supp.2d 288, 298-99 (D.N.J. 2011) (finding Plaintiff failed to establish prima facie case under EPA with respect to certain defendants because "she did not provide any evidence on how her job is substantially equal to those of the other department heads."); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 570 (S.D.N.Y. 2012) ("But [the plaintiff] fails to make out a *prima facie* case of an EPA violation [because she] has failed to point to any evidence in the record that tends to show that these three men did jobs that were substantially equal in skill, effort, and responsibility to [the plaintiff's]." (quotation omitted)); *see also Wheatley v. Wicomico Cnty., Md.*, 390 F.3d 328, 332 (4th Cir. 2004) ("We decline to accept the argument . . . that employees with the same titles and only the most general similar responsibilities must be considered 'equal' under the EPA."); *McLaughlin v. Esselte*

---

[22] No party has explicitly addressed Dr. Bruce Mixter.  However, Defendant asserts that the only appropriate comparator is Dr. Lebsack.  [#44 at 11]  Because Plaintiffs have not proffered any evidence regarding whether any other physician is an appropriate comparator, the Court finds that they have not met their prima facie burden as to any physician other than Dr. Lebsack.  In any event, Dr. Mixter was paid less than Plaintiffs. [*See supra* at 4]

*Pendaflex Corp.*, 50 F.3d 507, 513-14 (8th Cir. 1995) (finding two jobs not equal because the male employee performed additional tasks).

Defendant, however, appears to concede that Dr. Lebsack performed equal work to Plaintiffs.  [#44 at 11 ("The only Physician that could possibly be compared to the Plaintiffs was Dr. Lebsack.")]  The Court will thus direct Defendant's remaining arguments, below, as to only Dr. Lebsack.

b.  Working Conditions

Defendant next argues that Plaintiffs have failed to establish the second element of an EPA claim: that Dr. Lebsack and Plaintiffs worked under basically the same working conditions.  [#44 at 11]  Specifically, Defendant states that Dr. Lebsack primarily worked at a DCMH clinic located in Hotchkiss, Colorado, while Plaintiffs worked in a clinic located in Delta, Colorado.  [*Id*.; SOF ##69-70, 308]  Defendant also asserts that Dr. Lebsack was required to sometimes work at the hospital itself, which is located in Delta, Colorado, and that Dr. Lebsack therefore was required to commute, while Plaintiffs were not.  [*Id*.]

"The term 'working conditions,' as used in the EPA, is a term of art which refers to physical surroundings and hazards encountered on the job."  *Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 476 (D. Kan. 2004) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 202 (1974)). *See also*  29 C.F.R. § 1620.18(a) ("'Surroundings' measure the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity and their frequency. 'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause."). The EPA adopts a "flexible standard of similarity" as the basis for testing the working conditions requirement, which requires a "a practical judgment . . . in light of whether the differences

in working conditions are the kind customarily taken into consideration in setting wage levels."  29 C.F.R. § 1620.18(a).  "Generally, employees performing jobs requiring equal skill, effort, and responsibility are likely to be performing them under similar working conditions."  29 C.F.R. § 1620.18(b).

Here, Defendant does not point to differences in the physical surroundings or hazards of the jobs performed by Plaintiffs and Dr. Lebsack, other than to note that Dr. Lebsack must occasionally drive further than Plaintiffs to go to work.[23]  [#44 at 11]  The Court is unaware of any caselaw or provision of the EPA considering "commute" as a factor in the "working conditions" analysis, and Defendant points to none.  Thus, because Defendant otherwise concedes that Dr. Lebsack was performing work of equal skill, effort, and responsibility to Plaintiffs, Defendant has not met its summary judgment burden as to this element.  29 C.F.R. § 1620.18(b); *Mehus*, 222 F.R.D. at 476 ("[Defendant] provides no evidence that plaintiff [and comparators] are exposed to different physical surroundings or hazards in performing their duties, or any other evidence which indicates that the differences which it lists impose different working conditions on volleyball and basketball coaches.").

c.  Pay Disparity and Affirmative Defenses

Defendant next argues that Plaintiffs cannot meet the final element of an EPA claim: that Dr. Lebsack was paid more than Plaintiffs.  [#44 at 11-12]  Specifically, Defendant argues that: (1) Dr. Lebsack was paid less than all three Plaintiffs; (2) call

---

[23] The Court notes that Defendant provided no facts to substantiate this assertion.  In particular, the Court was presented with no facts explaining the distance each physician was required to drive for work. For all the Court knows, each of the Plaintiffs and Dr. Lebsack could live exactly equidistance from the various clinics and the hospital.

protection does not create an extra financial benefit because DCMH did not provide extra pay for call coverage; and (3) employees did not necessarily receive the benefit of any call protection listed in their contracts.  [*Id*.]

First, the parties dispute how this Court should calculate wages. [##61 at 9, 16; 63 at 8]  Under the EPA:

> [T]he term "wages" generally includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment.

29 C.F.R. § 1620.10.  The Court must therefore consider the salary, bonuses, and fringe benefits given to the various physicians by DCMH.[24]

It is undisputed that in 2017 Dr. Lebsack's base salary was less than each of the three Plaintiffs.  [SOF ##145 (Dr. Miller's rate of $83.30 per hour); 147 (Dr. Swanson's rate of $92.76 per hour); 153 (Dr. Bright's rate of $104.09 per hour); 155 (Dr. Lebsack's rate of $81.73 per hour)]  Indeed, Dr. Lebsack had the lowest salary of any of the family practice physicians, male or female, in 2017.  [*Id*.; *see supra* at 7, 11]  However, in addition to his salary, Dr. Lebsack received a $20,000 commencement bonus in 2017.  [SOF#155]  With the bonus, Dr. Lebsack's total pay in 2017 was $190,000.  [*Id*.; #44-5 at 40-55 (Dr. Lebsack's base salary in 2017 was $170,000)]  By contrast, in the 2017 contracts presented to Plaintiffs, their listed salaries were as follows: Dr. Bright's salary was

---

[24] Plaintiffs do not respond to Defendant's argument that the call protection provisions do not provide additional financial benefit under the EPA.  [*See generally* #61]  The Court has, additionally, found no case law supporting inclusion of call protection as a fringe benefit under the EPA, and has been provided no evidence by which to calculate how call protection would affect wages.

$216,499.92; Dr. Miller's salary was $181,927.20; and Dr. Swanson's salary was $202,587.84. [##44-6 at 36-47; 44-6 at 12-23; 44-6 at 24-35] Thus, considering Dr. Lebsack's bonus, Dr. Lebsack was paid more than Dr. Miller, but less than Drs. Swanson and Bright in 2017.  Plaintiffs have therefore met their burden to show a prima facie EPA case as to Dr. Miller, but not as to Drs. Swanson or Bright.  Accordingly, Defendant's Motion is GRANTED as to the EPA claims for Drs. Swanson and Bright.

The Court thus turns to Defendant's affirmative defenses regarding the wage disparity between Dr. Lebsack's and Dr. Miller's pay.  Defendant argues any pay disparity was the result of a differential based on a factor other than sex, including market factors in hiring new physicians.  [#44 at 12]; *see also* 29 U.S.C. § 206(d)(1) (providing an affirmative defense for any "differential based on any other factor than sex"); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1322 (9th Cir.1994) (finding that salary differentials based upon market conditions are permitted by the EPA).  To meet its burden at the summary judgment stage, Defendant must submit evidence to "prove at least one affirmative defense so clearly that no rational jury could find to the contrary."  *Mickelson*, 460 F.3d at 1311 (citation omitted).

Here, Defendant argues that Dr. Lebsack's employment package was based on market conditions at the time of his hiring.  [##44 at 12-13]  In support, Defendant has presented the sworn affidavit of Gwen R. Conrad, the Medical Staff Coordinator of DCMH who was involved in recruiting Dr. Lebsack.  [#44-3 at 4-7]  Ms. Conrad testifies that DCMH had been attempting to recruit a family practice physician for under $170,000 for more than a year, without any success.  [*Id.* at 5]  As a result, Ms. Conrad reached out to recruitment firms and was told that DCMH needed to offer between $170,000-$200,000

to be competitive in the market.  [*Id.*]  Ms. Conrad testifies that these market conditions caused her to raise the offer to $170,000, an offer Dr. Lebsack accepted.  [*Id.*]  In further support of Ms. Conrad's testimony, Defendant also presents evidence that Dr. Lebsack's starting salary was near the 10th percentile of 2015 salaries for physicians practicing family medicine with obstetrics, as reported in the 2016 MGMA physician salary report.  [##44 at 12; 61-36 at 6 (2016 report indicating 10th percentile of salary at $167,991)]

In opposition to this affirmative defense, Plaintiffs state in summary fashion that "the wage disparity was not based on any change in market conditions."  [#61 at 17] Plaintiffs then cite to facts that attempt to undermine the MGMA data.  [*Id.* (citing SOF## 310-19)] But Plaintiffs do not in any way challenge Ms. Conrad's sworn testimony that they had attempted to recruit a family practice physician for more than a year, that they were unable to hire anyone at the salary offered, that they consulted with recruitment firms who indicated that DCMH needed to increase the offered salary, and that these were the reasons they offered Dr. Lebsack the salary that he was offered.  Based upon the uncontradicted evidence that Dr. Lebsack's pay was based upon market conditions and not sex, the Court concludes that no rational jury could find that the pay differential between Drs. Lebsack and Miller were based upon sex.[25]  Accordingly, the Motion is GRANTED and the EPA claim is DISMISSED.

_____

[25] As indicated above, the only reason Dr. Lebsack was paid more than Dr. Miller during 2017 was because he was paid a $20,000 bonus.  *See supra* at 24.  Defendant has presented evidence showing that the bonus was a one-time, commencement bonus [*id.* at 7], and that commencement bonuses were regularly given by DCMH to newly hired physicians across all genders [*id.*].   Indeed, Dr. Miller was given an identical $20,000 commencement bonus when she was hired by DCMH in 2014.  [#63-3 at 1(20:21-23)] These facts further support the Court's conclusion that no reasonable juror could conclude that the pay disparity was based upon sex.

### 2. Title VII, the Pregnancy Discrimination Act, and the Colorado Anti-Discrimination Act

The Court next turns to Plaintiffs' claims under Title VII for sex discrimination, Title VII as extended by the Pregnancy Discrimination Act ("PDA") for pregnancy discrimination, and Colorado's Anti-Discrimination Act ("CADA") for sex and pregnancy discrimination.  [#9]  Claims under these statutes require similar analysis, and the Court will therefore consider them together.[26]  *Agassounon v. Jeppesen Sanderson, Inc.*, 688 F. App'x 507, 509 (10th Cir. 2017) (Title VII and the CADA "rise or fall together" and are therefore often analyzed together.); *Harris v. Envtl. Materials, LLC*, No. 18-cv-01329-GPG, 2018 WL 10604755, at *2 (D. Colo. Sept. 21, 2018) (finding that the CADA analysis "parallels that of its federal counterpart in Title VII, and the Colorado courts look to federal cases for guidance in applying the state statute.").

Claims under Title VII and CADA use the *McDonnell Douglas*[27] burden shifting framework, under which

> the initial burden is on the employee to make a *prima facie* showing of discrimination by the employer. Only when such a showing has been made does the burden shift to the employer to articulate some legitimate, nondiscriminatory reason for the questioned action. If the employer meets this burden, the employee must show that the stated reason is actually a pretext for prohibited discrimination.

---

[26] The Pregnancy Discrimination Act amended Title VII to "make[] clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1343 (2015). *See also* 42 U.S.C. § 2000e(k).  "In the Tenth Circuit, pregnancy discrimination claims are essentially the equivalent of a gender discrimination claim."  *Martin v. Canon Bus. Sol. Inc., No.*, 11-cv-02565-WJM-KMT, 2013 WL 4838913, at *8 (D. Colo. 2013) (citing *Orr v. City of Albuquerque*, 531 F.3d 1210, 1214 (10th Cir. 2008) ("*Orr II*")).
[27] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Sprague*, 129 F.3d at 1362 (internal quotations and citations omitted). *See also Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1353-54 (2015) (applying *McDonnell Douglas* analysis in PDA case).

To establish a prima facie case of Title VII employment discrimination, Plaintiffs must show: (1) membership in a protected class; (2) an adverse employment action; and (3) disparate treatment among similarly situated employees. *Payan v. United Parcel Ser.*, 905 F.3d 1162, 1168 (10th Cir. 2018).  Ultimately, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005) (citation and quotation omitted).

Defendant argues that: (1) Plaintiffs cannot prove they were constructively discharged; (2) Plaintiffs cannot prove intentional sex or pregnancy discrimination in pay or contract provisions; and (3) Dr. Miller did not exhaust administrative remedies regarding her PDA claim stemming from the Discharge in Employment Agreement Memorandum.  [#44 at 13-18]  The Court addresses each argument in turn.

<u>a. Constructive Discharge</u>

Defendant first argues that the allegedly inferior contract provisions and negative negotiation treatment do not support a constructive discharge claim because they did not create objectively intolerable working conditions.   [#44 at 15-17]   The Court agrees. "[C]onstructive discharge is an adverse employment action." *Strickland v. United Parcel Serv.*, 555 F.3d 1224, 1230 n.4 (10th Cir. 2009).   A constructive discharge claim has two elements:  (1) Plaintiff was unlawfully discriminated by the employer "to the point where a reasonable person in [her] position would have felt compelled to resign," and (2) plaintiff

actually resigned.  *Rivero v. Bd. of Regents of Univ. of New Mexico*, 950 F.3d 754, 761 (10th Cir. 2020) (quoting *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016)).

To succeed on a constructive discharge claim, a plaintiff must show that the conditions of employment were objectively intolerable and that she had "no other choice but to quit." *Id*. (quotation and emphasis omitted).  "The plaintiff's burden in a constructive discharge case is substantial . . . because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable."  *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (10th Cir. 2007) (quoting *Tran v. Trs. of the State Colls. in Colo.*, 355 F.3d 1263, 1270-71 (10th Cir. 2004)).

As an initial matter, Plaintiffs do not substantially respond to Defendant's argument that the contract terms and negotiation circumstances do not support a constructive discharge claim.[28]  [#61 at 20]  In particular, Plaintiffs do not explain how the contract terms and negotiations created an "intolerable" workplace.  Indeed, as evidence of "intolerable" conditions during the contract negotiations, Plaintiffs only point to the following: (1) that they received termination letters, (2) that Dr. Miller was escorted from the building, (3) that they did not receive the same contract provisions as male employees, and (4) that a male board member suggested that Dr. Swanson sign the employment agreement without having an attorney review it.  [#61 at 19]

---

[28]  Their response to Defendant's argument is, in total: "Alternatively, the Hospital constructively discharged her because 'by its discriminatory actions [it] forced [her] to choose between resignation or termination.' Alternatively, it constructively discharged each plaintiff 'through unlawful acts [that made] working conditions so intolerable that a reasonable person in [their] position would feel forced to resign.'"  [#61 at 20 (internal citations omitted)]

Most of these instances do not describe Plaintiffs' "working conditions," and instead describe employment decisions that Plaintiffs disagreed with but that did not create any immediate or actual change to their employment conditions.  [SOF ##211, 214-223 (termination notice which did not terminate employment for several more months and which DCMH later stated was not meant to terminate their employment but only terminate the current contract and get Plaintiffs to sign the new contract); SOF ##241-42 (Dr. Miller was not escorted from the building until after her employment was terminated)]. And a one-time comment by a male board member—one that does not even reference gender—hardly amounts to "intolerable" working conditions.

As to the contract terms themselves, Plaintiffs take issue with three provisions: (1) call protection, (2) term length, and (3) termination notice term.[29]  [*See* #61 at 18]  But Plaintiffs disagreed with these provisions not because they made Plaintiffs' present working conditions intolerable, but because they could *potentially* impact Plaintiffs in the future.  [#61 at 18 ("the lack of call protection meant that they faced the prospect of a much heavier call burden going forward"); *id*. at 18-19 (stating that the reciprocal notice of termination provisions could impact Plaintiffs negatively because "a hospital can absorb the unexpected loss of an employee much more easily than a private individual, supporting a family, can absorb the unexpected loss of her job and income.")]  Such hypothetical negative impact does not create an intolerable working condition.  *PVNF*, 487 F. 3d at 806 (affirming judgment as a matter of law on constructive discharge claim

---

[29] Plaintiffs also challenge the wage disparity [#61 at 18], which the Court addresses in more detail below.  Plaintiffs have not presented any evidence that the difference in wages made the working conditions intolerable such that they had no choice but to quit.

in part because the employee "quit before she knew precisely the effect the new pay plan would have on her salary").

In sum, Plaintiffs have not produced evidence showing that their actual working conditions were intolerable.  Indeed, Drs. Swanson and Bright continued to work at DCMH for several months, until their contracts officially lapsed.  [SOF ##67, 211, 214, 265]; *Nazinitsky v. Integris Baptist Medic. Ctr., Inc.*, No. CV-19-043-R, 2020 WL 1957914, at *10-11 (W.D. Okla. April 23, 2020) (finding conditions not objectively intolerable where, among other things, Plaintiff continued working for Defendant for two months after resignation).  And while it is clear that Plaintiffs were unhappy at the end of their tenure working for Defendant, "not every unhappy employee has an actionable claim of constructive discharge pursuant to Title VII."  *Block v. Kwal-Howells, Inc.*, 92 F. App'x 657, 662 (10th Cir. 2004) (quoting *Bolden v. PRC, Inc.*, 43 F.3d 545, 552 (10th Cir.1994)); *see also Anderson v. Clovis Mun. Schs.*, 265 F. App'x 699, 707 (10th Cir. 2008) ("Anderson may have felt 'ganged up on' and 'alone oftentimes,' but given the objective standard, an employee's subjective feelings or beliefs are not relevant in a constructive discharge claim." (quotation omitted)); *cf. Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1574 (10th Cir. 1992) (finding supervisors continuous harassment made it nearly impossible for Plaintiff to continue performing her job, showing a constructive discharge).  Accordingly, Defendant's Motion is GRANTED as to Plaintiffs' constructive discharge claims and those claims are DISMISSED.

Finally, in their Response, Plaintiffs argue that they have additionally brought claims for actual termination, not just constructive discharge, in violation of Title VII.  [#61 at 19-20]  They further argue that Defendant has not presented an argument for summary

judgment as to their termination claims.  [*Id.* at 20]  The Court agrees.  Plaintiffs' Complaint clearly states that Plaintiffs bring a claim for unlawful discharge as well as constructive discharge.  [#9 at ¶¶ 192, 198]  Defendant has presented no argument as to these claims [##44, 63], and they will proceed to trial.

b.  Wage Discrimination

Defendant next argues that Plaintiffs cannot prove their wage discrimination claims.  [#44 at 13-14]

i.    *Prima Facie Case*

To establish a prima facie case of wage discrimination under Title VII, a plaintiff must show that she occupies a job similar to that of higher paid male employees. *Sprague*, 129 F.3d at 1363.    Unlike an Equal Pay Act claim, a Plaintiff asserting a Title VII claim is not required to show that her job is "substantially equal" to that of higher paid employees, only that it is similar.   *Id.* at 1362-63.   Moreover, a defendant entitled to summary judgment on an EPA claim still can be liable for wage discrimination under Title VII.  *See Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 524–25 (7th Cir. 1994) ("Even when jobs are not sufficiently similar to constitute 'equal work' under the Equal Pay Act, a Title VII claim for wage discrimination is not precluded.").   "The burden is on the plaintiff to show she is similarly situated to the employee with whom she is comparing herself." *Block*, 92 F. App'x at 660 (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir. 1994)).

Defendant largely recounts its arguments under the EPA as applied to the Title VII "similar" standard.   [#44 at 13-14]   As with the EPA claim, Plaintiffs respond to this argument with a single sentence and then direct the Court to the Separate Statement of

Facts.  [#61 at 18 ("Contrary to [Defendant's] arguments . . ., the males and females performed substantially equal work, even though some performed endoscopies, dermatology, or occasionally work at Urgent Care.")]  As with the EPA claim, the identified facts do not inform the Court of the substance of the jobs performed by Plaintiffs and the male physicians, and the Court is left to speculate on the similarity of the jobs.

Given the obvious differences, as described in the EPA analysis,[30] and lacking information regarding the job duties and responsibilities of any physician, the Court cannot say that Plaintiffs were similarly situated to any physician other than Dr. Lebsack.[31] *Block*, 92 F. App'x at 660-61 (finding that plaintiff did not meet her burden to show that positions were similar where, among other things, male employee performed different types of work); *Lewis v. D.R. Horton, Inc.*, 375 F. App'x 818, 824 (10th Cir. 2010) (affirming summary judgment for defendant on Title VII claims where plaintiff merely repeated her EPA arguments, which did not describe the jobs being compared). *See also Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 979 (10th Cir. 1996) (finding similar titles alone does not satisfy the requirement of similarity between jobs).

Accordingly, Defendant's motion is GRANTED as to Plaintiffs' Title VII wage discrimination claims regarding all the male physicians, except Dr. Lebsack.[32]  Moreover,

---

[30] To recap, Plaintiffs performed different job duties than every identified male employee other than Dr. Lebsack.  For example, Plaintiffs all provided family practice and obstetrics services to DCMH.  But Drs. Marlin and Richman provided those services plus surgical endoscopy services.  And, later, Dr. Marlin ceased to provide obstetrics services at all. Dr. Ochoa provided family practice services, but also added dermatological and urgent care services.  Dr. Mixter, who is a male and was the lowest paid of all of the identified doctors, provided only family practice services.  *See supra* at 4-7, 11.

[31] Defendant conceded that the only physician with a substantially similar job to Plaintiffs was Dr. Lebsack.  [#44 at 11]

[32] Even assuming that Plaintiffs held positions similar to all of the identified male physicians, Defendant has met its light burden to demonstrate legitimate,

because Drs. Swanson and Bright cannot show that they were paid less than Dr. Lebsack, their Title VII wage discrimination claims are similarly DISMISSED.  *See supra* at 24-25; *Sprague*, 129 F.3d at 1363 (stating that a prima facie case of wage discrimination requires a plaintiff to show that she occupies a job similar to that of *higher paid* male employees).

### ii.       Nondiscriminatory Reason

As to the remaining claim comparing Dr. Lebsack's and Dr. Miller's wages, Defendant has met its light burden to demonstrate legitimate, nondiscriminatory reasons for any pay disparity.  *Sprague*, 129 F.3d at 1363 ("This burden is exceedingly light; the defendant must merely proffer non-gender based reasons, not prove them." (quotations omitted)).   Specifically, Defendant provides evidence that Dr. Lebsack was hired at a time when DCMH found it difficult to hire new family practice physicians and that the hospital based his wages off of market conditions.  [*See* #44 at 12-13]  By contrast, Defendant argues that Plaintiffs wages—which were set three years earlier when Defendant acquired DFP—were determined based on the salaries of physicians at DFP at the time of the acquisition.  [*Id.*]  Finally, Defendant argues that Dr. Lebsack's actual salary was lower than Dr. Miller's when removing the one time commencement bonus, which Dr. Miller also received when hired.  [#63 at 9]

---

nondiscriminatory reasons for any pay disparities.  *Sprague*, 129 F.3d at 1363.  In particular, Defendant argues—and Plaintiffs appear to agree—that a physician's scope of practice and privileges affect compensation.  [#44 at 14; SOF #5]  Thus, Defendant argues that Drs. Ochoa, Marlin, and Richman's additional scopes of practice warranted additional pay.  [#44 at 14]  And, as previously noted, Dr. Mixter was paid less than all three Plaintiffs.  [*See supra* at 4]  For substantially the same reasons as detailed below, Plaintiffs have not demonstrated pretext with respect to these proffered reasons.

###### iii.      Pretext

Because Defendant has proffered nondiscriminatory reasons for the wage discrepancy between Dr. Lebsack and Dr. Miller, the burden shifts back to Plaintiff to show pretext.  *Sprague*, 129 F.3d at 1262.  Plaintiffs can "demonstrate[ ] pretext by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (per curiam) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

When determining whether a proffered justification is pretextual, "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quotation omitted). This is because "courts may not act as a super personnel department that second guesses employers' business judgments." *Jaramillo*, 427 F.3d at 1308 (quotation omitted).

The only pretext argument Plaintiffs present in the argument portion of their response is:

> [T]he Hospital's acquisition of Delta Family Physicians in 2014 does not explain the pay discrepancy, especially because the Hospital gave Dr. Marlin a pay raise but did not give one to female physicians.

[#61 at 18]  Plaintiffs then point the Court to their statement of facts, where they have made additional argument. [*Id.* (citing SOF ##296-302)]  These facts do not address Defendant's argument that Dr. Lebsack was paid a salary based on the market rate for

family practice physicians at the time he was hired.   In a footnote in the factual background, Plaintiffs additionally list general reasons they believe Defendants arguments—broadly speaking—are pretextual.   [#61 at 10 n. 6]   The list provides no argument, citations to law, or detail, other than to again point the court to the Separate Statement of Facts.   [*Id*.]  As an initial matter, "[t]he district court is not required to integrate a non-movant's statement of disputed facts with the law, and counter the propositions advanced by the movant.   Were it that way, the district court would act as an advocate, rather than a neutral arbiter."  *Perez v. El Tequila, LLC*, 847 F. 3d 1247, 1255 (10th Cir. 2017).   Moreover, "[a] party's offhand reference to an issue in a footnote, without citation to legal authority or reasoned argument, is insufficient to present the issue for [the Court's] consideration."[33]  *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016).

---

[33] In any event, the arguments presented by Plaintiff in the Separate Statement of Facts do not identify "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action."  *Jaramillo*, 427 F.3d at 1308.  Indeed, the arguments presented in the Statement of Facts simply: (1) dispute which data from the market report Defendant should have relied on in setting a new hire salary [SOF ##314-15, 319] and (2) maintain that DCMH should have increased Plaintiffs salaries to match the market data [SOF ##320,322].  But in a pretext analysis, "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."  *Rivera*, 365 F.3d at 924-25 (quotation omitted).  Plaintiffs point to no evidence that challenges Ms. Conrad's affidavit, calls into question Defendant's reliance on the market salary range in setting new physician salaries, or disputes that the 10th percentile of family practice physician salaries in the 2016 report was around $170,000.  [#61-36 at 6]  Indeed, Plaintiffs point the Court to evidence that appears to validate the hospital's position.   [SOF#313 (pointing to Dr. Cleckler's deposition testimony, which stated that Dr. Miller's salary was also set on the low end of market salary offerings for 2014 because she was a new physician); #61-7 at 13(170:9-21); SOF#323 (pointing the Court to a document wherein DCMH HR Director Katzdorn considers increasing the new hire salary range above $170,000 because she wasn't receiving "any bites" on the job posting; #61-37 at 3]  What's more, Plaintiffs provide the Court with no legal citations to support their analysis.

In any event, this Court has already determined that Defendant has proven that its basis for Dr. Lebsack's pay was sex neutral, that the provision of a commencement bonus to Dr. Lebsack was also sex neutral and that his salary was otherwise less than Dr. Miller's.  *See supra* Section I.C.1.c.  Accordingly, Plaintiffs have not met their burden to show that Defendant's nondiscriminatory reasons for pay disparity between Dr. Lebsack and Dr. Miller were pretextual, and Defendant's Motion is GRANTED as to Plaintiffs' wage discrimination claims under Title VII, the PDA, and CADA.

c.  Contract Terms

As to Plaintiffs' claim that DCMH imposed worse contracts on Plaintiffs than the male physicians, Defendant argues that the contract provisions were not discriminatory because they were offered to and accepted by male physicians around the same time they were offered to Plaintiffs.  [#44 at 14-15]  A plaintiff's burden at the prima facie stage is not onerous.  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1152 (10th Cir. 2005).  To show disparate treatment, Plaintiffs need only show that at least one other similarly situated member of the non-protected class was treated more favorably than they were. *See id.*; *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000); *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998) (concluding that plaintiffs had satisfied their prima facie burden by demonstrating that they were terminated while "at least one younger and/or nonminority employee was retained"). Although some contract provisions offered to Drs. Swanson and Bright were also offered to male physicians, Plaintiffs *also* have presented evidence that Dr. Lebsack received superior terms than that offered to Plaintiffs, including a greater termination notice and improved call protection [*See supra* at 7, 11]  Moreover, Dr. Miller received contract terms

that were not offered to any other physician.  Specifically, she was offered only a 1 year term of contract and 30 day termination notice provision, while all other physicians were offered three year contract terms and greater termination provisions.  *See supra* at 11. Accordingly, Plaintiffs have met their prima facie burden as to the contract terms.

Defendant next argues that Plaintiffs cannot prove pretext as to these provisions. [#44 at 14-15]  However, under the *McDonnell Douglas* framework, Defendant must first proffer a nondiscriminatory reason for the disparate treatment before Plaintiff is required to show pretext.  *Sprague*, 129 F.3d at 1362.  Here, Defendant does not provide in its argument a nondiscriminatory reason for the differing contract provisions, and it therefore fails to meet its burden.  *See Belgasem v. Water Pik Tech., Inc.*, 457 F. Supp. 2d 1205, 1216 (D. Colo. 2006) (observing that "[Defendant] does not proffer any legitimate nondiscriminatory reason . . . [and there] is therefore no explanation in the record for [the plaintiff] to show to be pretextual").  The Motion is, accordingly, DENIED as to Plaintiffs claims stemming from the differing contract provisions.

### d.  Dr. Miller's Default in Employment Agreement Memorandum

Finally, Defendant argues that Dr. Miller's PDA claim stemming from the July 10, 2017 Default in Employment Agreement Memorandum should be dismissed because Dr. Miller did not file an action with the E.E.O.C. within 180 days of receiving the Memorandum.  [#44 at 18]  "A plaintiff must exhaust h[er] administrative remedies before bringing suit under Title VII."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir. 1997).  "The purpose behind the requirement of exhausting a claim with the EEOC is two-fold: 'protect[ing] employers by giving them notice of the discrimination claims being brought against them, [and] providing the EEOC with an opportunity to conciliate the

claim.'" *Johnson v. Sears, Roebuck & Co.*, No. 14-cv-01119-MEH, 2014 WL 5293559, at *4 (D. Colo. Oct. 16, 2014) (quotation omitted).

Plaintiffs do not respond to this argument.  [*See* #61 at 20 (stating only that FMLA retaliation claims do not require administrative exhaustion)]  Thus, to the degree that Dr. Miller sought to assert a claim for violation of the PDA stemming from the Memorandum, Defendant's motion is GRANTED.  *Hutton v. Woodall*, 70 F. Supp. 3d 1235, 1239 (D. Colo. 2014) (finding claims abandoned when the plaintiff failed to address the defendant's summary judgment arguments); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768-69 (10th Cir. 2001) (affirming district court's decision to grant summary judgment for defendants on a claim that the plaintiff abandoned when he failed to address it in his response to defendants' motion for summary judgment).

### 3.  Retaliation Under the FMLA

Finally, the Court turns to Dr. Miller's claims for retaliation in violation of the FMLA. To establish a prima facie case of FMLA retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the protected activity and the adverse action.  *Salemi v. Colo. Pub. Emp. Ret. Assoc.*, 176 F. Supp. 3d 1132, 1154 (D. Colo. 2016) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208 (10th Cir. 1997)).  The *McDonnell Douglas* burden shifting framework applies to FMLA retaliation claims. *Metzler v. Home Loan*, 464 F.3d 1164, 1170 (10th Cir. 2006).

The parties agree that Dr. Miller engaged in protected activity when she took intermittent FMLA leave beginning in February 2017.  [SOF#100]; *see also Metzler*, 464 F.3d at 1171 (stating that plaintiff clearly engaged in protected activity by taking FMLA

leave); *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287-88 (10th Cir. 2007) (stating that an FMLA retaliation claim may be brought "when the employee successfully took FMLA leave, was restored to her employment status, and was adversely affected by an employment action based on incidents postdating her return to work").  She also took FMLA leave in the fall of 2017, after giving birth.  [SOF#123]

Dr. Miller asserts that DCMH retaliated against her for taking FMLA leave by: (1) reprimanding her in the Memorandum; (2) insisting that she agree to an inferior employment contract; and (3) terminating her employment for refusing to sign that contract.  [##9 at ¶¶ 164-167; 61 at 17-20]  In its Motion, Defendant does not make any specific arguments regarding Dr. Miller's FMLA claims stemming from the altered contract terms and subsequent termination.  Accordingly, those claims shall proceed to trial.[34]

Defendant does, however, argue that Dr. Miller's claim stemming from the Memorandum fails because the Memorandum was not an adverse employment action. [#44 at 18]  Specifically, Defendant argues that the memorandum did not change any of Dr. Miller's employment conditions.  [*Id.*]  Plaintiff does not respond to Defendant's argument beyond the following statement:  "CEO Cleckler issued the reprimand because he was retaliating against Dr. Miller for her FMLA, not because of any misconduct."  [#61 at 20]  Not only does the statement not address the argument, but it also does not point the Court to any supporting evidence and   "[u]nsubstantiated allegations carry no

---

[34] To the degree that Defendant sought summary judgment on Dr. Miller's FMLA claims for the contract and the termination based on the same arguments presented for summary judgment as to the Title VII claims, those arguments fail for the reasons previously stated. *See supra* Section I.C.2.

probative weight in summary judgment proceedings."  *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (quotations omitted).

In any event, the Court agrees with Defendant that the Memorandum did not constitute an adverse employment action.  Although the phrase "adverse employment action" should be liberally defined, "a written warning is not necessarily a materially adverse employment action."  *Weil v. Carecore Nat., LLC*, 833 F. Supp. 2d 1289, 1297 (D. Colo. 2011).  Here, the reprimand had no impact on Dr. Miller's job, beyond her agreement to discontinue the use of cuss words at work.  [SOF#118]  Indeed, Plaintiffs admit that the reprimand did not factor at all into Dr. Miller's continued employment. [SOF#119]  Thus, Dr. Miller has not met her prima facie burden of demonstrating that the Memorandum was an adverse employment action.  *Weil*, 833 F. Supp. 2d at 1298 (finding issuance of a warning is not an adverse employment action in FMLA retaliation claim because plaintiff "was not demoted, her pay was not reduced, and her job responsibilities did not change"); *Martin v. Canon Bus. Sol., Inc.*, 11-cv-02565-WJM-KMT, 2013 WL 4838913, at *6 (D. Colo. Sept. 10, 2013) (finding that written warnings alone did not constitute an adverse employment action because "there [was] no evidence that they impacted [the plaintiff's] earnings, benefits, job responsibilities, or work conditions."). Accordingly, Defendant's Motion is GRANTED as to Dr. Miller's claim that the Memorandum constituted an adverse employment action.

## II.   MOTION TO EXCLUDE EXPERT TESTIMONY

The Court next turns to Defendant's Motion in Limine to Exclude Expert testimony. [#45]  Through the Motion, Defendant argues for the exclusion of the report from Plaintiffs' expert, Mr. Don L. Frankenfeld.  [*Id*.]  Mr. Frankenfeld was retained by Plaintiffs to opine

on the value of their damages.  [#45 at 2; 59 at 3]  His expert report includes damage calculations for each of the Plaintiffs based on earning capacity and comparison to other physicians employed by DCMH.  [#45 at 2; #59 at 4]  Defendant argues that Mr. Frankenfeld's report "is not based on sufficient facts, uses incorrect data, is factually and mathematically inaccurate, and was not created with appropriate methodology."  [#45 at 8]  Defendant further argues that Mr. Frankenfeld does not have appropriate expertise and experience to produce the opinions in the report.  [*Id*. at 9]

Based on the Court's review of the Motion and Mr. Frankenfeld's expert report, it appears that the opinions Defendant objects to all relate to a calculation of damages based on Plaintiffs' Equal Pay Act and Title VII wage discrimination claims.  [*See generally* #45]  Specifically, Defendant objects to Mr. Frankenfeld's calculation of damages as they relate to: (1) comparing the scope of practice of the various physicians; (2) calculating an obstetrics premium to compensate Plaintiffs for work not done by male comparators; (3) calculating a call premium for call not performed by male comparator; (4) calculation of the average compensation of comparators; and (5) calculation of Dr. Marlin's wages for the purpose of comparison.  [*See* #45 9-12]  Because this Court has granted Defendant's Motion for Summary Judgment as to all Equal Pay Act and Title VII wage discrimination claims, Mr. Frankenfeld's opinions regarding comparison wages are no longer relevant to existing claims in this matter.  Accordingly, Defendant's motion is DENIED as MOOT.

To the degree that Defendant sought to exclude Mr. Frankenfeld's testimony as it relates to the remaining claims in this matter, Defendant is permitted to file an additional motion under F.R.E. 702 presenting argument that is narrowly tailored to the remaining issues in this case.  Any such motion shall be filed no later than February 1, 2022.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [#44] is **GRANTED in part** and **DENIED in part** and Defendant's Motion in Limine to Exclude Expert Testimony [#45] is **DENIED as MOOT**.  More specifically, the Court holds as follows:

(1)  Defendant's Motion for Summary Judgment [#44] on Plaintiffs' Equal Pay Act Claims (Claim One) is **GRANTED** and summary judgment is entered in favor of Defendant on Plaintiffs' Claim One.

(2)  Defendant's Motion for Summary Judgment [#44] on Dr. Miller's FMLA claims (Claim Two) and PDA claims (Claim Three) is **GRANTED in part and DENIED in part**.  It is **GRANTED** as to Dr. Miller's claim under the FMLA and PDA stemming from the Default Employment Agreement Memorandum.  It is **DENIED** as to her claims stemming from her contract terms and termination.

(3)  Defendant's Motion for Summary Judgment [#44] is **GRANTED** on Plaintiffs' Claims under Title VII (Claim Three) and CADA (Claim Four) for wage discrimination and constructive discharge, and summary judgment is entered in favor of Defendant as to those claims.

(4)  Defendant's Motion for Summary Judgment [#44] is **DENIED** as to Plaintiffs' Claims under Title VII (Claim Three) and CADA (Claim Four) for discriminatory termination and contract terms.

(5)  Defendant's Motion in Limine to Exclude Expert Testimony [#45] is **DENIED as MOOT**.

DATED:  December 23, 2021                    BY THE COURT:

                                             s/Scott T. Varholak
                                             United States Magistrate Judge